UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
(GREENVILLE DIVISION)

| | |
|---|---|
| Bureau of Consumer Financial Protection; South Carolina Department of Consumer Affairs; and the State of Arkansas *ex rel.* Leslie Rutledge, Attorney General,<br><br>     Plaintiffs,<br><br>     v.<br><br>Candy Kern-Fuller, Howard Sutter III, and Upstate Law Group LLC,<br><br>     Defendants. | Case No. _____<br><br><br><br><br>COMPLAINT |

The Bureau of Consumer Financial Protection (Bureau), the South Carolina Department of Consumer Affairs (Department), and the State of Arkansas *ex rel.* Leslie Rutledge, Attorney General (Arkansas), bring this action against Candy Kern-Fuller, Howard Sutter III, and Upstate Law Group LLC (Defendants) under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, and the South Carolina Consumer Protection Code (SCCPC), and allege as follows.

**Jurisdiction and Venue**

1.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.      This Court has supplemental jurisdiction over the Department's state-law claims because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

3.    This Court has personal jurisdiction over Defendants because Defendants are located, reside, or do business in this district. 12 U.S.C. § 5564(f).

4.    Venue is proper because Defendants are located, reside, or do business in this district. 12 U.S.C. § 5564(f); 28 U.S.C. 1391(b).

## Parties

5.    The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is authorized to initiate civil actions in federal district court to secure appropriate relief for violations of "Federal consumer financial law," 12 U.S.C. § 5564(a)-(b), including the CFPA, 12 U.S.C. § 5481(14).

6.    The Department is charged with administering and enforcing the South Carolina Consumer Protection Code, S.C. Code Ann. § 37-1-101 et seq. (SCCPC), which governs consumer-credit transactions made in South Carolina. The Department can seek an injunction against any person violating the SCCPC and request other appropriate relief, including reforming contracts to conform to the SCCPC, even though a consumer is not a party to the action. S.C. Code Ann. § 37-6-110. The Department can also bring an action against a person to recover a civil penalty for repeatedly and intentionally violating the SCCPC. The Department also is authorized to initiate civil actions in federal district court to enforce provisions of the CFPA with respect to an entity that is authorized to do business under South Carolina law. 12 U.S.C. § 5552(a)(1).

7.    Leslie Rutledge is the Attorney General for the State of Arkansas and is the chief legal officer of the State of Arkansas. Arkansas is authorized to initiate civil actions in federal district court to enforce provisions of the CFPA. 12 U.S.C. § 5552(a)(1).

8.      Defendant Upstate Law Group LLC (ULG) is a South Carolina corporation headquartered in Easley, South Carolina and was authorized to conduct business in South Carolina by the Secretary of State's Office. ULG provided substantial assistance to covered persons engaged in brokering contracts containing a South Carolina choice-of-law provision. ULG provided substantial assistance to covered persons engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5536(A)(3). ULG also engaged in collecting debt related to extensions of credit to consumers, acted as a custodian of funds for use by or on behalf of consumers, and provided payment-processing services to consumers by technological means. 12 U.S.C. § 5481(15)(A)(iv), (15)(A)(vii), (15)(A)(x). ULG is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5)-(6).

9.      Defendant Candy Kern-Fuller engaged in offering or providing consumer-financial products or services, including by acting as a custodian of consumer funds, providing payment-processing services to a consumer by technological means, and collecting debt related to a consumer-financial product or service, and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5)-(6), (15)(A)(iv), (15)(A)(vii), (15)(A)(x). Kern-Fuller is also a managing partner and owner of ULG. She has managerial responsibility for ULG and materially participates in the conduct of ULG's affairs. Kern-Fuller is therefore a "related person" under the CFPA, 12 U.S.C. § 5481(25)(C)(i), (ii), and is thus deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B). Kern-Fuller also provided substantial assistance to covered persons engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5536(A)(3).

10.     Defendant Howard Sutter III engaged in offering or providing consumer-financial products or services, including by acting as a custodian of consumer funds, providing payment-processing services to a consumer by technological means, and collecting debt related to a

consumer-financial product or service, and is therefore a "covered person" under the CFPA. 12

U.S.C. § 5481(5)-(6), (15)(A)(iv), (15)(A)(vii), (15)(A)(x). Sutter was also a managing partner

and owner of ULG until at least November 2019. He had managerial responsibility for ULG and

materially participated in the conduct of ULG's affairs. Sutter is therefore a "related person"

under the CFPA, 12 U.S.C. § 5481(25)(C)(i), (ii), and is thus deemed a "covered person" under

the CFPA. 12 U.S.C. § 5481(25)(B). Sutter also provided substantial assistance to covered

persons engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5536(A)(3).

### Factual Background

11.    In 2012, Defendants began working with a series of companies that brokered

contracts offering high-interest credit to consumers, primarily disabled veterans.

12.    These companies were Andrew Gamber's Arkansas-based companies, Voyager

Financial Group, LLC, BAIC, Inc., and SoBell Corp., Katharine Snyder's Mississippi-based

company, Performance Arbitrage Company, Inc., and Katherine Snyder's South Carolina-based

company, Life Funding Options, Inc. (collectively, the Broker Companies).

### The Transactions

13.    The Broker Companies marketed their credit offers as purchases of consumers'

future pension or disability payments.

14.    The Broker Companies set up contracts between consumers and investors where

consumers received a lump-sum payment, ranging from a few thousand to tens of thousands of

dollars, and were thereafter obligated to repay a much larger amount by purportedly assigning to

investors part of the consumers' monthly pension or disability payments for five to ten years.

15.    The majority of the high-interest credit offers brokered by the Broker Companies were for veterans who have Department of Veterans Affairs (VA) disability benefits or pensions administered by the Defense Finance and Accounting Service (DFAS). The VA establishes a veteran's level of disability and administers disability-benefit payments. DFAS is a federal agency within the Department of Defense; it includes an office that issues monthly pension payments to military retirees.

16.    Federal law prohibits agreements under which another person acquires the right to receive a veteran's pension or disability payments. 38 U.S.C. § 5301. Thus, the Broker Companies' contracts are prohibited under federal law.

17.    South Carolina law, the governing law specified in the contracts' choice-of-law provision, prohibits an assignment of earnings for payment or as security for payment of a debt arising out of a consumer loan and deems a sale of unpaid earnings made in consideration of the payment of money to the seller of the earnings to be a loan secured by an assignment of earnings. S.C. Code Ann. § 37-3-403 (2012). "Earnings" includes periodic payments pursuant to a pension, retirement, or disability program. S.C. Code Ann. § 37-1-301(15) (2012). Thus, the Broker Companies' contracts are prohibited under South Carolina law.

18.    The Broker Companies, with Defendants' assistance, represented to consumers that the products they brokered were sales of payments and not high-interest credit offers. For example, the first page of the "New Seller Information Packet," sent to consumers by the Broker Companies, stated, "It is important to note that this is not a loan[.]" The first paragraph of a form email sent with the packet stated, "Please keep in mind that this is not a loan, you are selling a product for a set price."

19.     But the substance of the transactions indicates that the Broker Companies'
product was an offer of credit. Consumers had their creditworthiness assessed before they could
enter a contract. Consumers' payments were due on a regular, monthly schedule, and consumers
did not give up control over their future-income streams. And the contracts permitted repayment
from sources other than the contracted-for income stream. In fact, some consumers were required
to purchase life-insurance policies, and Defendants even used some investors' lump sums to
purchase an additional "suicide wrapper," so that should the consumer die and the income stream
stop, the outstanding amount on the contract would still be paid.

### Defendants' Role in Underwriting the Transactions

20.     Defendants assessed consumers' creditworthiness for the Broker Companies
before consumers were allowed to enter a contract.

21.     Defendants developed a risk-assessment process to evaluate the business risk that
consumers would default on their payments. A ULG employee pulled a background check on
each potential consumer and sent that information to Kern-Fuller or Sutter. Kern-Fuller or Sutter
also requested specific documents or information from the Broker Companies or directly from
consumers, including consumers' credit reports, asset and debt information, and monthly
budgets.

22.     If Defendants determined that a consumer had too much outstanding debt,
Defendants would instruct that the consumer had to pay off a certain portion of that debt before
Defendants would approve the transaction.

23.     The Broker Companies would not complete a transaction without Defendants'
approval.

## Defendants' Role in Payment
## Processing Using ULG's IOLTA Account

24.     Defendants used ULG's Interest on Lawyers Trust Account (IOLTA) to receive payments from consumers, send payments to investors, and distribute commissions under the Broker Companies' contracts.

25.     When a contract closed, the investor sent the purchase-price payment to ULG's account. Defendants would then distribute the money, including the Broker Companies' fees, the consumer's lump sum, and ULG's own fees for Defendants' closing and payment-processing services.

26.     Kern-Fuller developed the process for how payments were distributed and was responsible for ordering any distribution of funds from ULG's account. Sutter also was involved in the payment-distribution process and had the authority to submit transfer approvals to the bank.

27.     Consumers' ongoing, monthly payments were directed to ULG's account. Defendants tracked consumers' payments and controlled the distribution of those payments to the investors.

28.     From 2012 to at least 2016, veterans were required to instruct the VA, through the VA's online portal, to send their monthly pension or disability payments directly to ULG's account. If the amount of a veteran's monthly pension or disability payment was greater than the monthly payment the veteran allegedly owed under the contact, Defendants would remit the overpayment to the veteran's bank account.

29.     By 2018, Defendants instructed veterans, as well as non-veteran consumers, to make their monthly payments to ULG's account via ACH transfer from the consumer's own bank account.

**Defendants' Role in Debt Collection**

30.    If a consumer stopped making payments to ULG's account, Defendants would contact the consumer to try to get the consumer to resume payment. Kern-Fuller and Sutter were personally involved in contacting consumers to try to get them to resume payments.

31.    Many consumers realized the illegal nature of the transactions, and some told Defendants directly that they had stopped making payments because the transactions were illegal. In response, Defendants repeatedly told consumers that the transactions were legal and that they were obligated to continue making payments.

32.    Before signing the contracts, consumers were made to sign a document stating that if they "breach this agreement [they] will subject [themselves] to civil and/or criminal prosecution."

33.    Defendants sent demand letters to consumers, signed by Kern-Fuller, telling consumers that they were "in breach of [their] obligations under the Contract of Sale" and that they needed to arrange a payment "to stay in compliance with [their] contract[.]"

34.    If a consumer repeatedly failed to make payments, Defendants would file suit against the consumer in South Carolina state court to collect on the contract.

**Additional Factual Background Supporting**
**South Carolina State-Law Claims**

In support of the state-law claims asserted in Count VI, the Department further alleges as follows:

35.    Although the Broker Companies characterized the contracts as "sales of payments," the transactions were loans under South Carolina law.

36.     The Broker Companies brokered consumer loans with loan finance charges in excess of 12% a year.

## Count I
## Substantial Assistance for
## Deceptive Acts or Practices, in Violation of the CFPA,
## Asserted by the Bureau, the Department, and Arkansas

37.     The allegations in paragraphs 1 to 34 are incorporated here by reference.

38.     The Broker Companies are covered persons under the CFPA because they engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5481(5)-(7), (15)(A)(i).

39.     An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

40.     Information that is material to consumers is information that is likely to affect a consumer's choice of, or conduct regarding, a product or service.

41.     The contracts brokered by the Broker Companies were void from inception because federal law prohibits agreements under which another person acquires the right to receive a veteran's pension or disability payments, 38 U.S.C. § 5301, and because South Carolina law, which governs the contracts, prohibits sales of unpaid earnings and prohibits assignments of pensions as security on payment of a debt, S.C. Code Ann. § 37-3-403.

42.     The Broker Companies repeatedly misrepresented to consumers that the contracts they brokered are valid and enforceable. In fact, the contracts are void and illegal because assignments of veterans' pensions are prohibited by federal law, and sales of unpaid earnings and assignments of pensions as security on payment of a debt are prohibited under South Carolina law.

43.     The Broker Companies' misrepresentations of the contracts as valid and enforceable and their failure to disclose the illegality of the contracts were likely to mislead consumers acting reasonably under the circumstances.

44.     The Broker Companies' misrepresentations and omissions were material because they were likely to influence the decisions of consumers acting reasonably under the circumstances, including by leading consumers to believe that it was legal to sell or assign their pensions.

45.     Therefore, the Broker Companies engaged in deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

46.     It is unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person in violation of § 1031 of the CFPA, and the provider of such substantial assistance is deemed in violation of that section to the same extent as the person to whom such assistance is provided. 12 U.S.C. § 5536(A)(3).

47.     Defendants provided substantial assistance to the Broker Companies' deceptive acts or practices by: developing a pre-approval or risk-assessment process for the contracts and conducting underwriting; approving or denying consumers' applications to enter into the transactions; directing and administering the execution of the contracts; serving as the payment processor for the initial lump-sum payment and fees; and continuing to serve as the transactions' payment processor, tracking and controlling the collection and distribution of consumers' payments on the contracts.

48.     Defendants knowingly or recklessly provided this substantial assistance. Defendants knew or should have known that the contracts were illegal and void from inception. Defendants were aware not only that consumers questioned the legality of the transactions, but

also of multiple publicly available cease-and-desist orders issued against the Broker Companies by state regulators, which stated that veterans' pensions are unassignable under federal law. Defendants were also aware of several private lawsuits challenging the legality of the product offered by the Broker Companies.

49.     Therefore, Defendants are deemed to have engaged in deceptive acts or practices in violation of the CFPA to the same extent as the Broker Companies. 12 U.S.C. § 5536(A)(3).

**Count II**
**Substantial Assistance for**
**Deceptive Acts or Practices, in Violation of the CFPA,**
**Asserted by the Bureau, the Department, and Arkansas**

50.     The allegations in paragraphs 1 to 34 are incorporated here by reference.

51.     The Broker Companies are covered persons under the CFPA because they engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5481(5)-(7), (15)(A)(i).

52.     An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

53.     Information that is material to consumers is information that is likely to affect a consumer's choice of, or conduct regarding, a product or service.

54.     The Broker Companies' contracts provided for consumers to receive a lump-sum payment and thereafter repay a much larger total amount over time using their monthly pension or disability payments.

55.     The Broker Companies represented to consumers that their products were sales and not high-interest credit offers. In fact, these products were high-interest credit offers because they purported to allow consumers to incur a debt and defer the right to repay. 12 U.S.C. § 5481(7).

56.    The Broker Companies' misrepresentations and omissions regarding the nature of the products they brokered were likely to mislead consumers acting reasonably under the circumstances.

57.    The Broker Companies' misrepresentations and omissions were material to consumers because they were likely to influence the decisions of consumers acting reasonably under the circumstances, including by rendering consumers unable to compare the cost of the Broker Companies' products with other potential sources of credit.

58.    Therefore, the Broker Companies engaged in deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

59.    Defendants provided substantial assistance to the Broker Companies' deceptive acts or practices by: developing a pre-approval or risk-assessment process for the contracts and conducting underwriting; approving or denying consumers' applications to enter into the transactions; directing and administering the execution of the contracts; serving as the payment processor for the initial lump-sum payment and fees; and continuing to serve as the transactions' payment processor, tracking and controlling the collection and distribution of consumers' payments on the contracts.

60.    Defendants knowingly or recklessly provided this substantial assistance. Defendants knew or should have known that the contracts were not sales but high-interest credit offers. Defendants were aware of multiple publicly available cease-and-desist orders issued against the Broker Companies by state regulators and of various private lawsuits attacking the business model of the Broker Companies and other companies with similar business models.

61.    Therefore, Defendants are deemed to have engaged in deceptive acts or practices in violation of the CFPA to the same extent as the Broker Companies. 12 U.S.C. § 5536(A)(3).

**Count III**
**Substantial Assistance for**
**Unfair Acts or Practices, in Violation to the CFPA,**
**Asserted by the Bureau, the Department, and Arkansas**

62.    The allegations in paragraphs 1 to 34 are incorporated here by reference.

63.    An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition.

64.    The Broker Companies failed to inform consumers of their products' interest rates.

65.    The Broker Companies' practice caused or likely caused substantial injury to consumers because it prevented consumers from comparing alternative products. And by failing to inform consumers about the products' interest rates, the Broker Companies deprived consumers of information consumers would need to determine whether the product was usurious and therefore potentially unlawful under their state's law.

66.    Consumers could not reasonably have avoided injury in this situation; consumers could not reasonably be expected to make the interest-rate calculation themselves, particularly after the Broker Companies misrepresented that the product was not a high-interest credit offer.

67.    This injury was not outweighed by countervailing benefits to consumers or competition.

68.    Therefore, the Broker Companies engaged in unfair acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

69.    Defendants provided substantial assistance to the Broker Companies' unfair acts or practices by: developing a pre-approval or risk-assessment process for the contracts and conducting underwriting; approving or denying consumers' applications to enter into the

transactions; directing and administering the execution of the contracts; serving as the payment processor for the initial lump-sum payment and fees; and continuing to serve as the transactions' payment processor, tracking and controlling the collection and distribution of consumers' payments on the contracts.

70.     Defendants knowingly or recklessly provided this substantial assistance. Defendants knew or should have known that the Broker Companies' products carried an interest rate and that the Broker Companies did not disclose any interest rate to consumers. Defendants were aware of multiple publicly available cease-and-desist orders issued against the Broker Companies and of various private lawsuits attacking the business model of the Broker Companies and other companies with similar business models.

71.     Therefore, Defendants are deemed to have engaged in unfair acts or practices in violation of the CFPA to the same extent as the Broker Companies. 12 U.S.C. § 5536(A)(3).

### Count IV
### Substantial Assistance for
### Deceptive Acts or Practices, in Violation of the CFPA,
### Asserted by the Bureau, the Department, and Arkansas

72.     The allegations in paragraphs 1 to 34 are incorporated here by reference.

73.     The Broker Companies are covered persons under the CFPA because they engaged in brokering extensions of credit to consumers. 12 U.S.C. § 5481(5)-(7), (15)(A)(i).

74.     An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

75.     Information that is material to consumers is information that is likely to affect a consumer's choice of, or conduct regarding, a product or service.

76.    The Broker Companies represented to consumers that consumers may be subject to criminal prosecution if they breached their contacts. In fact, the consumers could not be criminally prosecuted for breaching their contracts.

77.    The Broker Companies' misrepresentation that consumers could be criminally prosecuted for failing to pay was likely to mislead consumers acting reasonably under the circumstances.

78.    The Broker Companies' misrepresentation was material to consumers because it was likely to influence the decisions of consumers acting reasonably under the circumstances, including by causing consumers to pay money they were not legally obligated to pay.

79.    Therefore, the Broker Companies engaged in deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

80.    Defendants provided substantial assistance to the Broker Companies' deceptive acts or practices by: developing a pre-approval or risk assessment process for the contracts and conducting underwriting; approving or denying consumers' applications to enter into the transactions; directing and administering the execution of the contracts; serving as the payment processor for the initial lump-sum payment and fees; and continuing to serve as the transactions' payment processor, tracking and controlling the collection and distribution of consumers' payments on the contracts.

81.    Defendants knowingly or recklessly provided this substantial assistance. Defendants knew or should have known that consumers could not be criminally prosecuted for breaching their contracts.

82.    Therefore, Defendants are deemed to have engaged in deceptive acts or practices in violation of the CFPA to the same extent as the Broker Companies. 12 U.S.C. § 5536(A)(3).

**Count V**
**Deceptive Acts or Practices, in Violation of the CFPA,**
**Asserted by the Bureau, the Department, and Arkansas**

83.    The allegations in paragraphs 1 to 34 are incorporated here by reference.

84.    Defendants collect on the contracts brokered by the Broker Companies, including by initiating ACH debts to take payments from consumers' bank accounts, demanding payments from consumers in letters and other communications, and filing suit when consumers failed to make payments.

85.    Defendants have represented, expressly or impliedly, that consumers are legally obligated to make payments in accordance with the terms of their contracts. In fact, the contracts were void from inception and consumers are not obligated to make payments.

86.    Defendants' misrepresentations and omissions regarding consumers' legal obligations to make payments were likely to mislead consumers acting reasonably under the circumstances.

87.    Defendants' misrepresentations and omissions were material because they were likely to influence the decisions of consumers acting reasonably under the circumstances, including by leading consumers to make payments that they were not legally obligated to make.

88.    Therefore, Defendants engaged in deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Count VI**
**Unconscionable Debt Collection, in Violation of the SCCPC,**
**Asserted by the Department**

89.    The allegations in paragraph 1 to 36 are incorporated here by reference.

90.    Defendants engaged in unconscionable conduct in attempting to collect a debt as defined in S.C. Code Ann. § 37-5-108.

91.     Defendants made fraudulent, deceptive, or misleading representations in connection with the collection of consumer debt. S.C. Code Ann. § 37-5-108(5)(c).

92.     Defendants filed actions for breach of contract and specific performance when they knew or should have known the contracts for sales of unpaid earnings and assignments of pensions as security on payment of a debt are prohibited under South Carolina law. Defendants repeatedly misrepresented the contracts as valid and enforceable.

93.     Therefore, Defendants engaged in unconscionable debt collection in violation of the SCCPC.

### Demand for Relief

Wherefore, the Bureau, the Department, and Arkansas request that the Court:

1.     permanently enjoin Defendants from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536(a), or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

2.     permanently enjoin Defendants from brokering, offering, or arranging purported sales or assignments of pensions or disability benefits;

3.     permanently enjoin Defendants from attempting to enforce any contract purporting to sell or assign a consumer's pension or disability benefits;

4.     permanently enjoin Defendants from all collection activity against any consumer for any contract purporting to sell or assign the consumer's pension or disability benefits;

5.     permanently enjoin Defendants from committing future violations of the SCCPC;

6.     permanently enjoin Defendants from assisting others engaging in any conduct proscribed by the Court;

7.     declare the contracts void ab initio and unenforceable;

8.      grant additional injunctive relief as the Court may deem just and proper;

9.      award restitution, damages, or other monetary relief against Defendants;

10.     order Defendants to pay redress to harmed consumers;

11.     order Defendants to disgorge all ill-gotten gains;

12.     impose on Defendants civil money penalties;

13.     order Defendants to pay the Bureau's, the Department's, and Arkansas's costs incurred in connection with prosecuting this action; and

14.     award additional relief as the Court may determine to be just and proper.

*(signature block on following page)*

Respectfully submitted,

Thomas G. Ward
*Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*
s/ David Hendricks
David Hendricks (Fed. ID # 10547)
Benjamin Konop (OH Bar # 0073458)
Telephone: (202) 435-7265
E-mail: benjamin.konop@cfpb.gov
Lane Powell (MI Bar # P79432)
Telephone: (415) 844-9784
E-mail: lane.powell@cfpb.gov
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7329
*Attorneys for Plaintiff Bureau of Consumer Financial Protection*

s/ Kelly H. Rainsford
Kelly H. Rainsford (Fed. ID #10209)
Telephone: (803) 734-4236
E-mail: KRainsford@scconsumer.gov
James C. Copeland (Fed. ID #12318)
Telephone: (803) 734-0375
E-mail: JCopeland@scconsumer.gov
South Carolina Department of
Consumer Affairs
293 Greystone Boulevard, Suite 400
P.O. Box 5757
Columbia, SC 29250-5757
*Attorneys for Plaintiff South Carolina Department of Consumer Affairs*

Leslie Rutledge
*Attorney General*
s/ Kelly H. Rainsford
Kate Donoven (AR Bar # 98189)
*Senior Assistant Attorney General*
(*pro hac vice* application to be filed)
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-8114
Facsimile: (501) 682-8118
kate.donoven@arkansasag.gov
*Attorney for Plaintiff State of Arkansas ex rel. Leslie Rutledge, Attorney General*